LINDSEY R. PERRY *vs.* PLANNING BOARD OF NANTUCKET
(and a companion case[1]).

Nantucket.  November 3, 1982. — January 17, 1983.

Present: BROWN, GREANEY, & DREBEN, JJ.

*Subdivision Control*, Approval not required, Frontage on public way.
*Way*, Public: subdivision control.

Ways for which a town had taken easements in land and which were
shown as such on town plans did not satisfy the requirements of G. L.
c. 41, § 81L, twelfth par., for exemption of a plan of lots from the Sub-
division Control Law, in the absence of evidence that the ways existed
on the ground in a form that would assure efficient access to each lot.
[148-154]
The exemption from the Subdivision Control Law provided by G. L.
c. 41, § 81L, twelfth par., for lots having a frontage on a public way
was to be applied in light of the purposes of the Subdivision Control
Law as expressed in c. 41, § 81M, and, consequently, it was error for a
judge to rule that a plan of land was exempt under this provision with-
out making findings in terms of dimensions, surface, and suitability for
travel, as to the acceptability of the street or way on which the owner
relied in claiming the exemption. [154-155]
A plan of land depicting a single lot which was to be severed from the
owner's remaining land would not warrant a municipal planning
board's endorsement under G. L. c. 41, § 81P, to the effect that ap-
proval under the Subdivision Control Law was not required, where
the plan did not show on its face that the owner's remaining land was
unsuitable for building and thus not an additional lot within the defi-
nition set out in G. L. c. 41, § 81L. [155-157]
Discussion of a landowner's right to construct access roads over unused
easements or unimproved public ways in which he owns the underly-
ing fee. [157-160]

CIVIL ACTIONS commenced in the Superior Court Depart-
ment on July 29 and August 3, 1981, respectively.

_____

[1] The companion case is between the same parties.

The cases were heard by *Griffin, J.*

*Charles A. Goglia, Jr.,* Town Counsel, for the defendant.

*Theodore L. Tillotson (Paul Killeen* with him) for the plaintiff.

GREANEY, J.  These are appeals by the planning board of the town of Nantucket (board) from judgments of the Superior Court (G. L. c. 41, § 81BB) annulling the board's decisions refusing endorsements under G. L. c. 41, § 81P,[2] as appearing in St. 1963, c. 363, § 1, that "'approval under the subdivision control law [was] not required'" (an 81P endorsement) in two cases involving plans submitted by the plaintiff, Lindsey R. Perry.[3]  The judgments ordered the board to place an 81P endorsement on each plan.

The cases were decided on a "Statement of Agreed Facts," incorporating various exhibits from which we draw this summary.  The plan in the first case (figure 1) was submitted to

---

[2] General Laws c. 41, § 81P, provides in pertinent part:

"Any person wishing to cause to be recorded a plan of land situated in a city or town in which the subdivision control law is in effect, who believes that his plan does not require approval under the subdivision control law, may submit his plan to the planning board of such city or town in the manner prescribed in section eighty-one T, and, if the board finds that the plan does not require such approval, it shall forthwith, without a public hearing, endorse thereon or cause to be endorsed thereon by a person authorized by it the words 'approval under the subdivision control law not required' or words of similar import . . . . Such endorsement shall not be withheld unless such plan shows a subdivision."

[3] The board's disapproval of Perry's requests led to the commencement of two separate actions in the Superior Court which were consolidated for purposes of trial and disposition.

the board by Perry on or about July 13, 1981, and shows the
proposed division of a tract into two lots (748 and 749).

The Nantucket zoning by-law requires that each buildable
lot in the relevant district have frontage of at least seventy-
five feet on a way.  Both lot 748 and 749 meet that require-
ment along Oakland Street, a way which has appeared on
town plans at least since 1927.  By an order of taking regis-
tered with the Land Court in 1962, the county commission-
ers of Nantucket took "an easement . . . for the purposes of a
public highway" in the land designated as Oakland Street.
Despite its depiction on town plans, and the taking of the
easement, Oakland Street has not been constructed on the
ground.  In denying Perry an 81P endorsement, the board
decided that the plan constituted a subdivision because "the
lots do not have frontage on a way as defined in [G. L. c. 41,
§] 81L of the Subdivision Control Act."

The plan in the second case (figure 2) was submitted by
Perry to the board on or about July 27, 1981, and shows a

FIGURE TWO

single triangular shaped lot (750), which has more than seventy-five feet of frontage along each of Oakland Street, Wyoming Avenue, and Midland Avenue. Oakland Street is the public way previously described. Wyoming Avenue is a "paper street" which, although shown on a Land Court plan, has not been constructed on the ground. By the 1962 order of taking referred to previously, the county took an easement for highway purposes in the land designated as Midland Avenue and, according to the stipulated facts, there is "an existing street or way located on the ground within the location of Midland Avenue." In denying an 81P endorsement, the board decided that this plan also depicted a subdivision because lot 750 lacked "frontage on a way described in [§] 81L of the Act." A composite of the lots and ways shown on the plans (which were filed with the board for action at different meetings) is shown in figure 3.

FIGURE THREE

After considering these facts and the exhibits, and after taking a view, the judge ruled that the proposed lots had "adequate access to public ways." She concluded that the board could not deny an 81P endorsement to either plan because, in its opinion, the public ways upon which the lots front are inadequate for the needs of vehicular traffic or the installation of municipal services. This conclusion represented a ruling of law that frontage of the proposed lots on a public way alone is sufficient to require an 81P endorsement without regard to whether the way has been built at all, or if it does exist, whether the way provides adequate access to the lots.

1. A "subdivision" for purposes of the Subdivision Control Law, G. L. c. 41, §§ 81K-81GG, is defined as "the division of a tract of land into two or more lots . . . ." G. L. c. 41, § 81L, as amended through St. 1979, c. 534. A division is excluded from the definition of a subdivision of G. L.

c. 41, § 81L, twelfth par., cl. (a), if "at the time when [the division] is made, every lot within the tract so divided has frontage on . . . a public way . . . ." The question for decision is what is intended by the term "public way" in this exclusion.

The Legislature provided, in G. L. c. 82, §§ 1-16, for the layout and establishment of highways within municipalities by county commissioners. In the ordinary case, the commissioners create the way by "laying it out" (i.e. fixing the way's termini, prescribing its boundaries, establishing it as a public easement of travel, and making any necessary land takings, see *Charlestown Branch R.R.* v. *County Commrs. of Middlesex*, 7 Met. 78, 84 [1843]; *Fuller* v. *Mayor of Springfield*, 123 Mass. 289, 291 [1877]; *Leahy* v. *Street Commrs. of Boston*, 209 Mass. 316, 317 [1911]), and by having the way built on the ground according to the directions and timetable set out in the commissioners' return under G. L. c. 82, § 8. When the way is completed, the municipality is required, among other things, to repair and maintain it, and the municipality becomes liable for damages caused by defects. See G. L. c. 84, §§ 1, 15 and 22. There is little doubt that the various statutes regulating the establishment and maintenance of public ways are designed to ensure safe and efficient access to the dwellings and buildings on abutting lands.

The Legislature presumably knew of the existing body of statutory law pertaining to public ways when it enacted the exemption from subdivision control contained in G. L. c. 41, § 81L, twelfth par., cl. (a). See generally *Mathewson* v. *Contributory Retirement Appeal Bd.*, 335 Mass. 610, 614 (1957). Cf. *Casagrande* v. *Town Clerk of Harvard*, 377 Mass. 703, 707 (1979). The exemptions from subdivision control contained in § 81L, twelfth par., are important components of the Subdivision Control Law which itself creates a "comprehensive statutory scheme," see *Costanza & Bertolino, Inc.* v. *Planning Bd. of No. Reading*, 360 Mass. 677, 679 (1971); *Cassani* v. *Planning Bd. of Hull*, 1 Mass. App. Ct. 451, 458 (1973); *Nantucket Land Council, Inc.* v.

*Planning Bd. of Nantucket,* 5 Mass. App. Ct. 206, 208 (1977), and which includes among its express purposes the protection of the "safety, convenience and welfare of the inhabitants of the cities and towns" by means of regulation of "the laying out and construction of ways in subdivisions providing access to the several lots therein . . . ." G. L. c. 41, § 81M, as amended through St. 1969, c. 884, § 2. We note that the Legislature has provided, consistent with these goals, that planning boards are to administer the law "with due regard for the provision of adequate access to all of the lots in a subdivision by ways that will be safe and convenient for travel; for lessening congestion in such ways and in the adjacent public ways; for reducing danger to life and limb in the operation of motor vehicles; for securing safety in the case of fire, flood, panic and other emergencies; . . . [and] for securing adequate provision for . . . fire, police, and other similar municipal equipment . . . ." *Ibid.* We note further that the exclusions set out in § 81L, twelfth par., which excuse a plan from subdivision approval,[4] thereby providing a basis for an 81P endorsement, do so with reference to specific objective criteria apparently chosen by the Legislature for the quality of access they normally provide. See *Gifford* v. *Planning Bd. of Nantucket,* 376 Mass. 801, 807 (1978). See also *Smalley* v. *Planning Bd. of Harwich,* 10 Mass. App. Ct. 559, 602 & n.5, 603 (1980). We conclude that whatever status might be acquired by ways as "public ways" for purposes of other statutes by virtue of their having

---

[4] In addition to frontage along a public way, an 81P endorsement can be obtained by showing that every lot within the division has the required frontage on "(a) . . . a way which the clerk of the city or town certifies is maintained and used as a public way, or (b) a way shown on a plan theretofore approved and endorsed in accordance with the subdivision control law, or (c) a way in existence when the subdivision control law became effective in the city or town in which the land lies, having, in the opinion of the planning board, sufficient width, suitable grades and adequate construction to provide for the needs of vehicular traffic in relation to the proposed use of the land abutting thereon or served thereby, and for the installation of municipal services to serve such land and the buildings created or to be erected thereon."

been "laid out," see generally *Fenn* v. *Middleborough,* 7 Mass. App. Ct. 80, 83-84 (1979), such ways will not satisfy the requirements of the "public way" exemption in § 81L, twelfth par., cl. (*a*), of the Subdivision Control Law, unless they in fact exist on the ground in a form which satisfies the previously quoted goals of § 81M.

Decisions which discuss the purposes of §§ 81L, 81M, and 81P, support this conclusion. It has been "emphasized repeatedly that a principal object of the law is to ensure efficient vehicular access to each lot in a subdivision, for safety, convenience, and welfare depend critically on that factor." *Gifford* v. *Planning Bd. of Nantucket,* 376 Mass. 801, 807 (1978), and cases cited. In *Gifford,* the "frontage on a public way" exclusion in § 81L, twelfth par., cl. (*a*), was construed and applied in light of the purposes set out in § 81M, to deny an 81P endorsement to a plan showing division of a parcel into forty-six lots which met the frontage requirements of the Nantucket zoning by-law, but which left "the main portions of some of the lots practically inaccessible from their respective borders on a public way."[5] 376 Mass. at 808-809. The *Gifford* court (at 807) explained the theory underlying an 81P endorsement in these terms: "Where our statute relieves certain divisions of land of regulation and approval by a planning board ('approval . . . not required'), it is because the vital access is reasonably guaranteed in another manner. The guaranty is expressed in §§ 81L and 81P of the statute in terms of a requirement of sufficient frontage for each lot on a public way. In the ordinary case, lots having such a frontage are fully accessible, and as the developer does not contemplate the construction of additional access routes, there is no need for supervision by the planning

---

[5] The lots in the *Gifford* case were joined to the public roads by means of connector strips ("rattails") of land some as long as 1,000 feet narrowing in places to as little as seven feet (narrower than the smallest piece of fire aparatus then in use in Nantucket) and requiring as many as seven changes of direction before the buildable portions of the lots were reached. Coincidentally, the land involved in the *Gifford* case is nearly adjacent to, and was once held in common ownership, with the land in the present case.

board on that score." The Supreme Judicial Court has also recognized that in cases where the frontage roads providing primary access to proposed lots are virtually impassable, a planning board can properly insist on compliance with subdivision control requirements. *Rettig* v. *Planning Bd. of Rowley*, 332 Mass. 476, 478, 481 (1955).[6] As a practical matter, we have interpreted the Subdivision Control Law in light of the reasoning and conclusion in the *Gifford* case to impose dual requirements for an 81P endorsement premised on one of the exclusions found in § 81L, twelfth par. There must be "(1) frontage on one of the three types of ways specified in G. L. c. 41, § 81L, . . . and (2) a planning board's determination under § 81P that adequate access, as contemplated by § 81M, otherwise exists." *Hrenchuk* v. *Planning Bd. of Walpole*, 8 Mass. App. Ct. 949 (1979). In *Hrenchuk*, we held that access was not adequate for purposes of the statute where it was not possible for vehicles to reach the interstate highway on which the lots fronted. By contrast, we decided in *Gallitano* v. *Board of Survey & Planning of Waltham*, 10 Mass. App. Ct. 269 (1980), that the reasoning of the *Gifford* case would not permit denial of an 81P endorsement to a division where all the lots fronted on a public way, even though the frontage of one of the lots was for the minimum distance required by law (twenty feet) and the access strip connected the buildable portion of that lot to the way at such an angle that access to the lot by larger vehicles might have been difficult. We stated that the *Gifford* case "was not intended . . . to broaden the powers of planning boards," and explained the holding of

---

[6] *Rettig* was decided under the predecessor to the current G. L. c. 41, § 81L. If it arose under the current statute, its outcome would be determined by application of cl. (c) of the twelfth par. of § 81L, governing property fronting on "a way in existence with the subdivision control law became effective in the city or town . . ., having, in the opinion of the planning board, sufficient width, suitable grades and adequate construction to provide for the needs of vehicular traffic . . ., and for the installation of municipal services . . . ." There is no claim that this provision is applicable to either Oakland Street or Midland Avenue even though the latter exists in some form and has appeared on town plans since 1927.

the case as follows: "The *Gifford* case *does* preclude mere technical compliance with frontage requirements in a manner that renders impossible the vehicular access which frontage requirements are intended in part to ensure; it does not create a material issue of fact whenever municipal officials are of the opinion that vehicular access could be better provided for." *Id.* at 273 (emphasis original). We then held "[a]s a rule of thumb" that an 81P endorsement could not be denied upon an invocation of the principles of *Gifford*, where the access strip connecting the buildable part of the lot to a public way is "not narrower than the required [twenty foot] frontage at any point." *Id.* at 273-274. Our conclusion was based on the fact that any impediment to access created by such an access strip was necessarily "implicit in a zoning scheme which allows frontage as narrow as twenty feet." *Id.* at 273. In our view, these cases recognize that while a planning board's authority in this area is limited, a board can properly deny an 81P endorsement because of inadequate access, despite technical compliance with frontage requirements, where access is nonexistent for the purposes set out in § 81M.

Perry points out distinctions between the facts of the cases just discussed and those of the present controversy. Without question those cases dealt with obstacles to access between the buildable portions of the proposed lots and the admittedly adequate public ways on which they fronted, while this case concerns the adequacy of the public way itself. We also recognize that § 81M, insofar as it treats the sufficiency of access, is couched primarily in terms of the adequacy of subdivision ways rather than the adequacy of the public ways relied upon by an owner seeking exemption from subdivision control. We do not view these considerations as affecting the soundness of our reasoning. The board's power in these circumstances arises out of the provisions of the subdivision control law itself, read in light of the statutes pertaining to public ways and relevant decisions. The statutory and decisional framework provides for orderly land development through the assurance that proper access

to all lots within a subdivision will be reasonably guaranteed. Because no way exists on the ground to serve lots 748 and 749, the board was right to require the plan's antecedent approval under the Subdivision Control Law, and its action should not have been annulled.

2. The second plan (lot 750) presents a different problem. The board denied an 81P endorsement for the plan in language similar to that used to deny endorsement of the first plan ("lack of frontage on a way described in [§] 81L"). The lot borders upon Oakland Street, the unbuilt way described in part 1 of this opinion, upon Wyoming Avenue (stipulated to be a "'paper street' . . . shown on [a] Land Court plan . . . [but] not . . . constructed on the ground," and not asserted to be a public way), and upon Midland Avenue. The judge correctly ruled that Wyoming Avenue did not meet the exclusion requirements.[7] She did not address the adequacy of the lot's frontage on Oakland Street to satisfy the exemption. We have already held that it would not suffice. She focused on Midland Avenue (probably because Perry focused on that way in his application for exclusion) and ruled that the lot's frontage on that way required an 81P endorsement. We know from the stipulated facts that "[t]here is an existing street or way located on the ground within the location of Midland Avenue," and we can ascertain from the plan attached to the 1962 order of taking that a "travelled way" is at least partially contained within the boundaries of the easement taken for Midland Avenue.[8] The judge took a view but made no findings of fact as to the access provided by Midland Avenue in terms of the way's dimensions, surface, or suitability for travel by or-

---

[7] The judge concluded that there was "no evidence that Wyoming Avenue was ever laid out and taken by public authority in the manner prescribed by G. L. c. 82, §§ 1-32, or [that it] was otherwise designated as a public way under *Fenn* v. *Middleborough*, 7 Mass. App. Ct. 80 (1979)."

[8] The parties' stipulation appears to reconcile any ambiguity between the boundaries of the traveled way shown on the plan attached to the 1962 order of taking and the physical boundaries of Midland Avenue by stating that the way existing on the ground is, for purposes of this case, within the location of Midland Avenue.

dinary and public safety vehicles choosing instead to rely on Midland Avenue's status as a "public way."

On this record, the propriety of the board's action on the lot 750 plan cannot be properly determined since there is no way of telling whether Midland Avenue on the ground furnishes acceptable access to the lot. The case involving that plan must be reconsidered by the board. An 81P endorsement may not be denied if Midland Avenue is adequate to provide the type of access contemplated by § 81M, notwithstanding the board's good faith belief that alternative methods of access might be preferable.

3. Perry relies upon the ruling of the judge set forth in pertinent part in the margin[9] to argue that the lot 750 plan merits an 81P endorsement under the reasoning of *Bloom* v. *Planning Bd. of Brookline*, 346 Mass. 278 (1963).[10] *Bloom* involved the division of a tract into two parcels, one of which had less than the minimum frontage required by the zoning law for building lots. The deficiency was clearly shown on the plan which was submitted for an 81P endorsement. The Supreme Judicial Court held that since the plan showed that the lot with inadequate frontage would be unusable for building, it was not a plan subject to subdivision control. The court observed that by the definition in G. L. c. 41, § 81L, a "lot" is "an area of land . . . used, or avail-

---

[9] "There is no evidence as to the frontage of the remainder of the lot from which lot 750 is taken on any public way. This lack of evidence as to the frontage of the remainder of plaintiff's lot does not present a problem, however. If the remainder of plaintiff's lot has required frontage (75 feet) on either Oakland Street or Midland Avenue or another public way, then the requirements of G. L. c. 41, § 81L are met and the proposed plan . . . does not disclose a subdivision under that statute. If the remainder of plaintiff's lot does not have the required frontage on either Oakland Street or Midland Avenue (or any other public way), then it does not constitute a "lot" as defined in G. L. c. 41, § 81L, and the plan . . . does not disclose a subdivision under that statute."

[10] The question of an owner's entitlement to an 81P endorsement when the facts are agreed usually presents for decision a question of law. Such is the situation here, and, as a consequence, both this court and the Superior Court can decide the question upon a ground other than that relied upon by the board.

able for use, as the site of one or more buildings," and a "subdivision" is "the division of a tract of land into two or more lots . . . ." The court reasoned that a division of land into two parcels, one of which clearly could not be used for building under the zoning law, was therefore not a division into two "lots" and, a fortiori, not a subdivision. *Bloom* v. *Planning Bd. of Brookline, supra* at 283-284. The case is distinguishable from the present one. In *Bloom*, the petitioner's plan disclosed the residual lot's inadequacy for building purposes. It was thus clear that the parcel with inadequate frontage was not a § 81L "lot." In the present case, the plan of lot 750 contains no information at all concerning the dimensions or boundaries of the tract from which lot 750 is proposed to be severed. The remaining land may or may not be "available for use . . . as the site of one or more buildings." *Id.* at 283. Unlike the situation in *Bloom*, Perry's plan is not one "which disavows any claim of existing right to use [the remaining land] as a zoning by-law lot." *Id.* at 284.

Perry also argues (and the judge agreed) that the remaining land either has the required frontage on a public way, for that reason becoming exempt from subdivision control under § 81L, twelfth par., cl. (*a*), or does not have it, in which case it is not a "lot" as defined in § 81L. In the latter situation, Perry contends, the plan would be entitled to an 81P endorsement because it would fall short of the § 81L definition of subdivision (i.e. "division into two or more lots"). See generally *Smalley* v. *Planning Bd. of Harwich,* 10 Mass. App. Ct. at 604-605. This reasoning fails to address the public's right not to be misled by endorsements on recorded plans. See *Bloom* v. *Planning Bd. of Brookline, supra* at 284. Although an 81P endorsement carries no implication that the subject lots comply with zoning ordinances in all respects, see *Smalley* v. *Planning Bd. of Harwich, supra* at 603, it is expected to address "the fact of adequate frontage of the newly created lots." *Lee* v. *Board of Appeals of Harwich,* 11 Mass. App. Ct. 148, 152 (1981). Where the plan shows on its face that the endorsement was

occasioned by the fact that inadequate frontage brought a parcel outside the definition of a § 81L "lot," the danger that the public might be misled into believing the plan showed only buildable lots is dissipated. The *Bloom* opinion suggests that such noncompliance could be shown by depicting the inadequate frontage on the plan or by an endorsement that the subject lot could not be used for building, but preferably by both methods. Were an 81P endorsement to be granted on Perry's theory, however, on the plan as submitted, the public would have no way of ascertaining the basis of the decision from the recorded plan and could be misled as to the adequacy of frontage on a public way. On remand, Perry may amend the plan of lot 750 to show the boundaries and dimensions of the tract from which it is to be severed, and the board need not grant an 81P endorsement unless he does so. If appropriate, assuming the requirements for an 81P endorsement are otherwise met, the board may require a further endorsement of noncompliance with the zoning code on the plan as a condition of approval.

4. Perry expresses concern that he may be left without the realistic prospect of access to the proposed lots sufficient to permit development. He may, of course, petition to have paper or otherwise inadequate public ways constructed or upgraded. Responsibility for construction rests with the town, in accordance with the return specified in G. L. c. 82, § 8, absent contrary provision by the county commissioners.[11] The town, however, is free to contract with others, including Perry, to do the work. See generally *Tuckerman* v. *Moynihan*, 282 Mass. 562, 566 (1933). In the alternative, Perry could petition to have the ways discon-

---

[11] The record does not disclose whether the return described in § 8 has been made. We express no opinion on the validity of a taking which is not accompanied by a return. If the return has not been made, Perry may seek to compel it. If it has been or is made, but not complied with by the town, he may request the commissioners (who in Nantucket are the board of selectmen, see G. L. c. 34, § 4) to construct the way. See G. L. c. 82, § 14. The commissioners are not under any legal duty to do so. See *Marcus* v. *County Commrs. of Norfolk*, 344 Mass. 749, 750 (1962).

tinued. The county holds only an easement in the land. In such a case, "the law in Massachusetts is well settled . . . that upon the discontinuance of the highway, the soil and freehold revert to the owner of the land."[12] *Harris* v. *Elliott*, 35 U.S. (10 Pet.) 25, 55-56 (1836). See also *Fairfield* v. *Williams*, 4 Mass. 427, 428-429 (1808).

Perry also may have the right to construct access roads over the unused highway easements or unimproved existing ways in which he holds the underlying fee, if there is a refusal either to construct the ways or abandon the easements. "By the location of a highway an easement of passage is secured for the public with all incidental privileges thereby implied. The fee of the land commonly remains in the owner, who may make any use of it not inconsistent with the paramount right of the public." *Commonwealth* v. *Surridge*, 265 Mass. 425, 427 (1929). See also *Commonwealth* v. *Morrison*, 197 Mass. 199, 204 (1908). The statement in the *Surridge* case about rights of servient owners appears entirely consistent with the long standing rule, in cases of easement by grant, that "an owner may use the land for all purposes which are not inconsistent with the easement . . . or which do not materially interfere with its use." *Western Mass. Elec. Co.* v. *Sambo's of Mass., Inc.*, 8 Mass. App. Ct. 815, 818 (1979), and cases cited. See *Butler* v. *Haley Greystone Corp.*, 352 Mass. 252, 258 (1967). See also Restatement of Property § 486 (1944); 3 Tiffany, Real Property § 811, at 351-352 (3d ed. 1939); 2 American Law of Property § 8.66, at 279 (Casner ed. 1952); Burby, Real Property § 32 (3d ed. 1965). In a leading California case

---

[12] The record does not indicate whether Perry has held the fee in the highway property since the time of the taking or if he acquired it by later conveyance. The record does indicate, however, that he held, at the time of the submission of the plans, the land on either side of that part of Oakland Street which would allow access to Midland Avenue, with the exception of a tract on one side of the intersection of those ways. If Perry acquired the land by conveyance, it would be presumed, absent contrary indication, that any deeds which described the property lines with reference to ways were intended to convey the fee to the centerline of the way. See *Smith* v. *Hadad*, 366 Mass. 106, 108 (1974).

it was held that the servient owner, who had granted to a municipality an easement to install water lines, was entitled to use or allow others to use the burdened land for the same purposes, so long as there was no "unreasonable interference" with the municipality's rights. *Pasadena* v. *California-Michigan Land & Water Co.*, 17 Cal. 2d 576, 579-580 (1941). The court indicated that if at some future time "in the reasonable use of its prior easement, the city require[d] the space occupied by . . . the defendant, its paramount right must prevail," but that "[u]ntil a point of unreconcilable conflict is reached . . . a concurrent use of the land for similar purposes" would be permitted. *Id.* at 582, 583. Construction or upgrading of the roads here, to appropriate standards, appears compatible with the existence of the present public highway easements, particularly in light of the rule that doubts as to interference with the easement "should be 'resolved in favor of the freedom of land from servitude.'" *Hemenway* v. *Bartevian*, 321 Mass. 226, 229 (1947), quoting from *St. Botolph Club, Inc.* v. *Brookline Trust Co.*, 292 Mass. 430, 433 (1935). The principles discussed appear to be equally applicable to public highway easements acquired through taking.[13] See generally *Tyler* v. *Hudson*, 147 Mass. 609, 612-613 (1888); *Conklin* v. *Old Colony R.R.*, 154 Mass. 155, 156 (1891); *Perley* v. *Cambridge*, 220 Mass. 507, 512-513 (1915) (holding in accord with *Pasadena* v. *California-Michigan Land & Water Co., supra,* on nearly identical facts, where easement aquired by eminent domain). We caution, however, that the remedy just dis-

---

[13] Allowing Perry to proceed with such construction would eliminate any potential for abuse latent in c. 82. The statute appears to provide no procedure by which someone in Perry's position can compel a governmental entity either to build or discontinue a way laid out and taken pursuant to its terms. Similarly, the statute imposes no specific time limits on any government agency to proceed with construction and it has been held that the county commissioners cannot be compelled to adhere to their own timetable. See *Marcus* v. *County Commrs. of Norfolk*, 344 Mass. 749, 750 (1962). In a theoretical sense, unless private construction of unbuilt or underbuilt highway easements is permitted, c. 82 could be used perversely to impede otherwise lawful land development through the taking of easements for highways which are never constructed or abandoned.

cussed should be viewed as extraordinary. We would expect that Perry and local officials will work responsibly to achieve a practical solution for problems created by the present state of the ways. Suffice it to say that Perry is not at this point caught in a legal "Catch-22." [14]

The judgments are vacated and new judgments are to be entered. As to case No. 1884, the judgment is to state that the board did not exceed its authority in disapproving the plaintiff's plan on the ground stated in its decision. As to case no. 1887, the judgment is to remand the plaintiff's plan to the board with directions that the board is to hold a hearing on the plan within thirty days of the date of the judgment and to take final action on the plan within forty-five days from the date of the judgment in a manner consistent with statutes, applicable rules and regulations, and with this opinion. In the exercise of its discretion the Superior Court may provide in the judgment that it shall retain jurisdiction over case no. 1887 pending final action by the board.

*So ordered.*

---

[14] A term made popular by Joseph Heller's novel of the same name and defined as "a paradox in which seeming alternatives actually cancel each other out, leaving no means of escape from a dilemma." The American Heritage Dictionary 212 (1976).